**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **ELIZABETH JONES,**<br><br>    Plaintiff,<br><br>v.<br><br>**ETHICON, INC., et al.,**<br><br>    Defendants. | Civil Action No. 7:20-CV-128 (HL) |

**ORDER**

This case originated in the Southern District of West Virginia as a part of MDL 2327 ("Ethicon MDL"), 2:12-md-2327, one of seven MDLs totaling over 100,000 cases involving the use of transvaginal surgical mesh to treat pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI"). By Transfer Order dated June 17, 2020, the case was transferred from the MDL to this Court for final resolution. (Doc. 53). Discovery in this matter is complete. Prior to transfer, the parties filed dispositive and <u>Daubert</u> motions, responses, and replies. Now before the Court are Defendants Ethicon, Inc. and Johnson & Johnson's Motion for Partial Summary Judgment (Doc. 41); Plaintiff Elizabeth Jones' Motion to Exclude Certain Opinions and Testimony of C. Bryce Bowling, M.D. (Doc. 42); and Defendants' Motion to Limit the Case-Specific Opinions and Testimony of Brian Raybon, M.D. (Doc. 44).

**I.     BACKGROUND**

On April 25, 2011, Plaintiff Elizabeth Jones underwent surgery at Archbold Medical Center in Thomasville, Georgia to address a Grade 3 to 4 bulging cystocele, or prolapsed bladder, and urinary incontinence. (Doc. 14, p. 5; Doc. 47-1, p. 23, 79). Her surgeon, Dr. Timothy Grayson, implanted two mesh devices, the Prolift+M and TVT-O, which are manufactured by Defendants Ethicon, Inc. and Johnson & Johnson. (Doc. 14, p. 5; Doc. 47-1, p. 9-10). The surgery went well, and Plaintiff experienced no major complications. (Doc. 47-1, p. 93-95, 97; Doc. 47-3, p. 83). In January 2015, Dr. Steven Petrou at the Mayo Clinic in Jacksonville, Florida diagnosed Plaintiff with erosion of the mesh. (Doc. 47-5, p. 15-16). Dr. Petrou conducted four subsequent operations to remove the eroded mesh on March 6, 2015; October 19, 2015; April 15, 2016; and June 20, 2017. (Id. at p. 17, 21-22, 27-29). Following the June 20, 2017 surgery, Plaintiff underwent surgery again after Dr. Petrou discovered that the mesh had eroded into Plaintiff's bowel, necessitating emergent bowel surgery. (Id. at p. 31-32, 102-103). Dr. Brian Raybon, an urogynecologist retained by Plaintiff to provide expert testimony in this case, opines that as a direct result of the 2011 implantation of the TVT-O and/or Prolift+M, Plaintiff suffered

> mesh erosion, multiple surgeries[,] including an associated bowel perforation, vaginal discomfort, pain, recurrent urinary tract infections, pain with intercourse, [and] heavy bleeding and discharge.

2

(Doc. 47-4, p. 8).

## II. DAUBERT MOTIONS

### A. Legal Standard

An expert witness may testify in the form of an opinion if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993). The party relying on the testimony of a proposed expert witness bears the burden of laying, by a preponderance of the evidence, a foundation for the admission of its expert's testimony. Corvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002) (quoting Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999)).

The trial court functions as a "gatekeeper," testing the reliability and relevancy of the proposed expert's scientific opinions. Daubert, 509 U.S. at 589–93. The court must consider at the outset whether: (1) a proposed expert is qualified to competently testify concerning his opinions; (2) his methodology is sufficiently reliable; and (3) his testimony would assist the jury, through the application of scientific, specialized, or technical expertise, to determine a fact in

issue or understand the evidence. United States v. Fazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)). However, this inquiry is "a flexible one," focusing "on the principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595.

"A district court's gatekeeper role under Daubert is not intended to supplant the adversary system or the role of the jury." Maiz v. Virani, 253 F.3d 641, 665 (11th Cir. 2001) (internal quotation and citation omitted). Rather the objective of the gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999). And the district court has "substantial discretion in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable." United States v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999). Where the expert testimony generally satisfies Rule 702, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

**B.     Plaintiff's Motion to Exclude C. Bryce Bowling, M.D.**

Plaintiff moves to exclude certain testimony and opinions offered by Defendants' expert witness C. Bryce Bowling. Specifically, Plaintiff moves the Court to prohibit Dr. Bowling from testifying or offering his opinion regarding (1) the adequacy of the relevant Instructions for Use ("IFU"), or what warnings the instructions should or should not include; and (2) unsupported opinions about complication rates and causation by unskilled surgeons.

As discussed below, the Court concludes that Defendants are entitled to summary judgment as to Plaintiff's failure to warn claims. Accordingly, the Court finds as moot Plaintiff's motion to exclude Dr. Bowling's opinions concerning the adequacy of the IFUs.

Plaintiff next seeks to exclude the following opinions offered by Dr. Bowling regarding complication rates as conclusory and lacking factual support:

- "The vast majority of mesh exposures are small and asymptomatic. And those that do require treatment are typically easy to resolve in the right hands." (Doc. 42-1, p. 49).

- "The overwhelming majority of patients experience a complete resolution of their symptoms following a quick revision procedure." (Id. at p. 50).

- "[C]omplications from mesh procedures are many times related to the skill level of the surgeon." (Id.).

Dr. Bowling is a Board Certified Urogynecologist, a gynecologist with advanced training in the treatment of women with complex pelvic floor issues, and a Pelvic Reconstructive Surgeon. (Doc. 42-1, p. 2). He currently serves as Director for the Division of Female Pelvic Medicine and Reconstructive Surgery at the University of Tennessee Medical Center. (Id. at p. 3). He regularly treats patients experiencing urinary and bowel incontinence, pelvic prolapse/relaxation defects, pelvic pain syndromes, urinary and defecatory voiding dysfunction, interstitial cystitis, childbirth injuries, and genital fistulas. (Id. at p. 2). He also has extensive experience correcting mesh complications. (Id. at p. 3). Dr. Bowling has performed thousands of pelvic floor reconstructive surgeries both with and without the use of mesh products. (Id. at p. 4). He has trained with and performed the Gynecare Prolift TVT procedures since 2004 and has completed over 2000 retropubic sling procedures. (Id. at p. 5). Additionally, Dr. Bowling has performed hundreds of transobturator slings. (Id.).

As an experienced treating physician and surgeon familiar with implanting various sling and mesh products, Dr. Bowling exhibits the requisite qualifications to opine about complications that may arise from mesh procedures and the potential causes for those complications. Plaintiff's motion therefore is **DENIED**.

**C.      Defendants' Motion to Exclude Brian Raybon, M.D.**

Defendants move to limit the testimony of Plaintiff's causation expert Dr. Brian Raybon regarding the following:

1. opinions about (a) the adequacy of Defendants' warnings for Plaintiff's mesh implant; (b) any opinion that Plaintiff suffered complications caused by shrinkage or contraction of her mesh implant; and (c) opinions about the availability of safer alternative designs and procedures;

2. opinions about the adequacy of the implanting physician's informed consent process for Plaintiff;

3. speculative opinions that Plaintiff's injuries were caused by certain characteristics of the mesh; and

4. causation opinions based on a faulty differential diagnosis.

Again, because the Court grants Defendants' motion for summary judgment on Plaintiff's failure to warn claims, Defendants' motion to exclude any opinion offered by Dr. Raybon regarding the adequacy of the warnings for the mesh implant or the adequacy of the implanting physician's informed consent process are now moot. The Court **RESERVES** ruling on the remaining issues until further testimony may be offered and evaluated at trial.

## III. MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation marks omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary

judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

### B. Discussion

Plaintiff's Short Form Complaint (Doc. 1) filed in the MDL asserts the following claims as set forth in the Master Complaint (Doc. 54-1):

Count I – Negligence

Count II – Strict Liability—Manufacturing Defect

Count III – Strict Liability—Failure to Warn

Count IV – Strict Liability—Defective Product

Count V – Strict Liability—Design Defect

Count VI – Common Law Fraud

Count VII – Fraudulent Concealment

Count VIII – Constructive Fraud

Count IX – Negligent Misrepresentation

Count X – Negligent Infliction of Emotional Distress

Count XI – Breach of Express Warrant

Count XII – Breach of Implied Warranty

Count XIII – Violation of Consumer Protection Laws

Count XIV – Gross Negligence

Count XV – Unjust Enrichment

Count XVII – Punitive Damages

Count XVIII – Discovery and Rule Tolling

Defendants move for summary judgment as to Counts I, II, III, IV, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, XV. Based on prior rulings issued in the MDL, Plaintiff does not contest Defendants' motion as to Counts II, VI, VII, VIII, IX, X, XI, XII, XIII, XV. (Doc. 47, p. 5). Defendants' motion accordingly is granted as to those claims. However, Plaintiff contends that Defendants are not entitled to summary judgment as to her claims for negligence (Count I); strict liability—failure to warn (Count III); strict liability—defective product (Count IV); and gross negligence (Count XIV). For the following reasons, Defendants' motion for partial summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

### 1. Defective Product

In her Short Form Complaint, Plaintiff indicated that she intended to pursue a claim for "Strict Liability—Defective Product." (Doc. 1, p. 4). Georgia law recognizes three types of strict-liability claims relating to defective products: manufacturing defects, design defects, and marketing or packaging defects. Banks v. ICI Americas, Inc., 264 Ga. 732, 733 (1994).[1] Defendants argue that there is no stand-alone claim under Georgia law for "defective product" and that

---

[1] The parties agree that Georgia law applies to Plaintiff's claims. (Doc. 41, p. 3; Doc. 47, p. 6).

Count IV, therefore, should be dismissed as duplicative of Plaintiff's design defect claim.[2]

While Plaintiff argues against the dismissal of Count IV, stating that Count IV should instead be read together with Count V, her design defect claim, she concedes that "Count IV states a strict liability claim for design defect under Georgia law." (Doc. 47, p. 11). Count IV of the Master Complaint alleges that Defendants' products "were defective and unreasonably dangerous to foreseeable consumers, patients, and users, including Plaintiff[ ], and the warning labels[ ] and instructions were deficient." (Doc. 54, ¶ 110). This statement effectively is an umbrella assertion for each of the three strict liability claims recognized under Georgia law. The next paragraph, however, alleges more specifically that Defendants' products "are inherently dangerous and defective, unfit and unsafe for their intended and reasonably foreseeable uses, and do not meet or perform to the expectations of patients and their health care providers." (Id. at ¶ 111). These allegations are functionally equivalent to those asserted in Count V, which provides that the product implanted in Plaintiff "was not reasonably safe for its intended use and was defective as described herein with respect to its design." (Id. at ¶ 116).

---

[2] Defendants have not moved for summary judgment on Plaintiff's design defect claim. Thus, that claim will proceed to trial.

Plaintiff has not otherwise demonstrated that Georgia law recognizes an independent claim for "defective product." The Court concludes that Plaintiff's "defective product" claim arises from identical allegations in another count. Accordingly, the Court finds that Plaintiff's "defective product" claim is duplicative of Plaintiff's design defect claim and **GRANTS** Defendants' motion to dismiss Count IV.

### 2. Failure to Warn

Defendants contend they are entitled to summary judgment on Plaintiff's failure to warn claim because Dr. Timothy Grayson, Plaintiff's implanting physician, was aware of the risks posed by Prolift+M and TVT-O, and no evidence in the record suggests that "a different warning would have changed Dr. Grayson's decision to implant the devices at issue." (Doc. 41, p. 4). Plaintiff argues that Defendants overstate the import of Dr. Grayson's testimony and that Dr. Grayson's generalized knowledge concerning the risks posed by *any* mesh device is insufficient to establish Dr. Grayson's understanding of the particularized risks associated specifically with Prolift+M and TVT-O.

"In standard products liability cases premised on a failure to warn, Georgia law insists that a plaintiff show that the defendant had a duty to warn, that the defendant breached that duty, and that the breach proximately caused the plaintiff['s] injury." Dietz v. Smithkline Beecham Corp., 598 F.3d 812, 815 (11th

Cir. 2010). "[T]he duty to warn arises whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product." Chrysler Corp. v. Batten, 264 Ga. 723, 724 (1994). Georgia law recognizes the learned intermediary doctrine, which provides that the manufacturer of a prescription drug or medical device "is not normally required to warn the patient of dangers in its use"; rather "a warning as to possible danger in its use to the prescribing physician is sufficient." Ellis v. C.R. Bard, Inc., 311 F.3d 1272, 1279 (11th Cir. 2002) (quotation marks and citations omitted); McCombs v. Synthes (U.S.A.), 250 Ga. App. 543, 545 (2001) ("It is well settled that the 'learned intermediary' rule . . . is applicable to medical devices implanted in patients under the supervision of a physician.").

Generally, the inquiry under the learned intermediary doctrine begins with a determination whether the manufacturer provided the physician with an adequate warning. Dietz, 598 F.3d at 816. "If the warning was adequate, the inquiry ends, and the plaintiff cannot recover." Id. (citing Singleton v. Airco, Inc., 169 Ga. App. 662, 664 (1984)). But, if the warning is inadequate, "the plaintiff must demonstrate that the deficient warning proximately caused the alleged injury to prevail." Id. And, in cases where "a learned intermediary has actual knowledge of the substance of the alleged warning and would have taken the same course of action even with the information the plaintiff contends should

13

have been provided, courts typically conclude that . . . the causal link is broken and the plaintiff cannot recover." Ellis, 311 F.3d at 1283 n.8 (quotation marks and citation omitted).

Contrary to Plaintiff's assertion that Dr. Grayson provided only "vague" statements regarding the basis for his knowledge of the risks associated with the devices at issue, Dr. Grayson's unequivocal testimony is that he was aware of both the generalized risks of implanting pelvic mesh devices and native tissue repair as well as the particular risks of TVT-O and Prolift+M. During Dr. Grayson's deposition, Defendants probed the doctor's experience and knowledge regarding a variety of procedures and devices he utilized during his tenure as a surgeon and the risks posed. (Doc. 47-1, p. 23-26, 29-34, 41-44,45-46). Defendants also questioned Dr. Grayson about his specific experiences with the TVT-O and Prolift+M products manufactured by Defendants. (Id. at p. 36-38; 43-50; 59-62; 67-68). Dr. Grayson testified that his partner, Dr. Nick Quinif, who had performed numerous TVT sling operations, trained him on the TVT-O transobturator sling and proctored him on his first five or six cases. (Id. at p. 36-37). When sales representatives for Defendants came into the office, they also demonstrated on a model how to use the product. (Id. at p. 36). Dr. Quinif discussed potential risks of the TVT-O procedure with Dr. Grayson. (Id. at p. 45). Dr. Grayson further testified that he read about complications and risks in

medical literature and that he kept apprised of those risks. (Id.). With that knowledge, and with the knowledge of Plaintiff's medical history, Dr. Grayson still recommended the TVT-O to Plaintiff. (Id. at p. 44, 46-49).

Similarly, Dr. Grayson testified that he received and read peer-reviewed medical literature for Prolift+M. (Id. at p. 61). He also affirmed that he reviewed the package inserts for both the TVT-O and the Prolift+M. (Id. at p. 113-14). Based on his review of the medical literature and his knowledge of the risks associated with using synthetic mesh and native tissue repair to treat a prolapsed bladder, Dr. Grayson was aware of the potential for a gamut of medical issues that could arise following the procedure. (Id. at p. 65-67).

Dr. Grayson discussed with Plaintiff the benefits and risks associated with surgery and the implantation of the TVT-O and Prolift+M devices. The doctor informed her of the risk for "bleeding, infection, pain, mesh erosion, continued incontinence[ ] postoperatively, urinary retention, a possible requirement for catherization, loss of life, and chronic debility." (Id. at p. 81). He also discussed the potential inability to remove the mesh, particularly in instances where "scar tissue grows into it and it becomes difficult to remove and it becomes adherent to other organs." (Id. at p. 120). Despite knowledge of these potential complications, Dr. Grayson recommended the implantation of the TVT-O and Prolift+M products to treat Plaintiff's medical conditions, believing that they were the best option for

Plaintiff. (Id. at p. 83-84). When asked whether he continued still stood by that decision, Dr. Grayson responded affirmatively. (Id. at p. 84). Following Plaintiff's surgery, Dr. Grayson continued to perform prolapse surgeries with the Prolift product until such time as the product was taken off the market. (Id. at 126-27). Even then, he ceased using the product in his surgical practice because it was no longer available, not based on a safety concern. (Id. at p. 129).

Plaintiff has pointed to no evidence demonstrating that Defendants' failure to warn Dr. Grayson about the risks of implanting the surgical mesh products proximately caused her injuries. Rather, Dr. Grayson clearly testified that even with knowledge of the potential risks posed by the Prolift+M and TVT-O, he still would have recommended the products to treat Plaintiff's condition. This admission "severs any potential chain of causation," and Plaintiff's failure to warn claim thus fails. Dietz, 598 F.3d at 816. The Court accordingly **GRANTS** Defendants' motion for summary judgment as to Plaintiff's failure to warn claim.

### 3. Negligence

Defendants argue that Count I should be dismissed because "[g]eneral negligence is a theory of liability in a products liability claim . . . . [and] not a stand-alone cause of action." (Doc. 41, p. 6) (quoting Grieco v. Tecumseh Prods. Co., No. 4:12-cv-195, 2013 WL 5755436, at *5 (S.D. Ga. Oct. 23, 2013)). Defendants further suggest that Georgia law does not distinguish between strict

liability claims and negligence and that the Court should either merge the claims or dismiss the claims for negligence as duplicative. Plaintiff disagrees, arguing that under Georgia law while the negligence and strict liability analyses overlap, a legal distinction between the claim remains.

Count I does not state a claim for general negligence. Rather, the Master Complaint alleges that Defendants "breached their duty of care and were negligent . . . in the design, manufacture, labeling, warning, instruction, training, selling, marketing, and distribution of the Pelvic Mesh Products in one or more of the following respects:" (1) negligent design; (b) negligent manufacture; (c) negligent failure to test; (d) negligent failure to inspect; (e) negligent failure to train; (f) negligent failure to warn; (g) negligent marketing; and (h) negligent promotion. (Doc. 54, ¶ 91). Defendants appear to seek dismissal or consolidation only of Plaintiff's negligence claims that have a strict liability analog, namely her claims for negligent design defect, negligent manufacturing defect, and negligent failure to warn.

Count I of the Master Complaint sets forth a claim for negligent design defect. Then Count V of the Master Complaint outlines a separate claim for strict liability design defect. "Georgia law has long recognized [the distinction] between negligence and strict liability theories of liability," and the Georgia Supreme Court has declined "to conclude definitively that the two theories merge in design defect

17

cases." Banks, 264 Ga. at 735 n.3 (1994) (citations omitted). "Nevertheless, Georgia courts apply the same risk-utility analysis to both types of claims, which requires plaintiffs to prove that the allegedly defective product poses an unreasonable risk of harm to the consumer." May v. Ethicon, Inc., 1:20-CV-322-TWT, 2020 WL 674357, at *3 (N.D. Ga. Feb. 11, 2020) (citing Banks, 264 Ga. at 735). Because the same analysis applies, courts frequently treat the separately pleaded causes of action as a single claim. See Frazier v. Mylan Inc., 911 F. Supp. 2d 1285, 1299 (N.D. Ga. 2012) ("Regarding a negligent design defect claim and a strict liability claim for a design defect, both claims use the same risk-utility analysis, and therefore, will be treated as one claim."); Schmidt v. C.R. Bard, Inc., No. 6:14-CV-62, 2014 WL 5149175, at *6 (S.D. Ga. Oct. 14, 2014) (consolidating negligence and design defect claims into a single count). The Court finds this approach to be prudent and orders that Plaintiff's strict liability design defect claim and her negligent design defect clam shall be consolidated for the purposes of trial.

In her response to Defendants' motion for summary judgment, Plaintiff conceded to the entry of summary judgment on her strict liability manufacturing claim. (Doc. 47, p. 5). Although Georgia law recognizes an independent cause of action for negligent manufacturing, see Miller v. Ford Motor Co., 287 Ga. App. 642, 644 (2007), Plaintiff has presented no evidence to establish the essential

elements of that claim. Accordingly, to the extent that Plaintiff intends to pursue a claim for negligent manufacturing, Defendants are entitled to summary judgment, and the Court **GRANTS** Defendants' motion. Additionally, because the Court has already determined that summary judgment is proper as to Plaintiff's strict liability failure to warn claim, the Court must by extension **GRANT** Defendants' motion for summary judgment on Plaintiff's negligent failure to warn claim. As discussed above, Plaintiff has established no genuine issue of material fact regarding causation. See Battersby v. Boyer, 241 Ga. App. 115, 117 (1999) (recognizing that a negligent failure to warn claim may be brought concomitantly with the analogous strict liability claim).

### 4. Gross Negligence

Count XIV of the Complaint alleges a separate claim for gross negligence. Defendants argue this count should be dismissed because it "is nothing more than another way to allege negligence" and bears no relevance in this products liability case. (Doc. 41, p. 7). Georgia law defines gross negligence as the absence of even "slight diligence," or "that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances." O.C.G.A. § 51-1-4. Gross negligence thus is a degree of negligence requiring a heightened standard of proof and not merely a secondary way of alleging ordinary negligence as Defendants suggest. Defendants have not

otherwise explained why Plaintiff's gross negligence claim cannot be separately pleaded nor why the Court should prevent a jury from determining whether Plaintiff can satisfy the elevated gross negligence standard. Therefore, the Court **DENIES** Defendants' motion for summary judgment on Plaintiff's gross negligence claim.

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Partial Summary Judgment. (Doc. 41). The Court **FINDS AS MOOT** in part and **DENIES** in part Plaintiff's Motion to Exclude Certain Opinions and Testimony of C. Bryce Bowling, M.D. (Doc. 42). The Court **FINDS AS MOOT** in part and **RESERVES** ruling in part on Defendants' Motion to Limit the Case-Specific Opinions and Testimony of Brian Raybon, M.D. (Doc. 44). The Court shall place this case on the next available trial calendar.

**SO ORDERED**, this the 30th day of September, 2020.

*s/ Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**

aks